**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Securities and Exchange Commission,

               Applicant,

      v.

Securities Investor Protection Corporation,

               Respondent.

Civil Action No. 11-mc-678 (RLW)

**MEMORANDUM OPINION AND ORDER**

      This case was commenced by an Application of the Securities and Exchange Commission ("SEC").  (Dkt. No. 1).  The SEC seeks an order from this Court mandating that the Securities Investor Protection Corporation ("SIPC") file an application for a protective decree with the United States District Court for the Northern District of Texas (the "Texas federal court").  If filed, the SIPC application would seek to commence a liquidation proceeding in the Texas federal court pursuant to Section 5(a)(3) of the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78eee(a)(3).

      In support of its Application, the SEC has filed an Ex Parte[1] Motion for an Order to Show Cause why SIPC should not be ordered to file an application in the Texas federal court with respect to the Stanford Group Company.  (Dkt. No. 2).  SIPC, in turn, has filed a Motion to Strike the Ex Parte Motion for an Order to Show Cause.  (Dkt. No. 3).  SIPC also requests that this Court convene a case management conference pursuant to FED. R. CIV. P. 16.  Id.  This

---

[1]      Though the motion is titled "ex parte," it was served on SIPC, and SIPC has filed a response.

matter is before the Court for resolution of the SEC Motion for an Order to Show Cause and the SIPC Motion to Strike.

## I.    BACKGROUND

This case is an outgrowth of the 2009 collapse of a group of companies owned or controlled by Robert Allen Stanford.  Stanford allegedly sold more than $7 billion worth of certificates of deposit ("CDs") that were issued by the Stanford International Bank, Ltd. ("SIBL"), an Antiguan bank.  The CDs were marketed by the Stanford Group Company ("SGC"), a now-defunct broker-dealer that was registered with the SEC and that was a member of SIPC.  The SEC contends that Stanford actually misappropriated billions of dollars and operated a fraudulent "Ponzi scheme" in which obligations of the CDs were paid using the proceeds from the sale of new CDs rather than from earnings, liquid assets or reserves. Following an investigation, the SEC brought a civil enforcement action against Stanford and his entities in the Texas federal court.  Federal prosecutors have also brought criminal charges against Stanford in that court.  The Texas federal court has appointed a Receiver to oversee the assets of SGC and other Stanford entities.  The Receiver reports that, as of February 2009, SGC had approximately 32,000 active accounts for which it acted as the introducing broker.

In early 2009, the Receiver asked SIPC to review whether the SGC customers who were allegedly defrauded were entitled to protection from SIPC.  When Congress passed the SIPA, it sought to protect customers of failed broker-dealers who "found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings," leading to "disastrous effects on customer assets and investor confidence . . . ."  SIPC v. Barbour, 421 U.S. 412, 415 (1975).  Congress created SIPC, a non-profit, private membership corporation to which most broker-dealers registered with the SEC, including SGC, are required to join.  Id. at 416.  SIPC

members pay assessments, and when SIPC member firms encounter financial difficulties, SIPC

has the authority to commence a "liquidation proceeding, applicable only to member firms,

designed to accomplish the completion of open transactions and the speedy return of most

customer property."  Id.  Such a liquidation proceeding is commenced by SIPC filing an

"application for a protective decree" in the United States District Court.  15 U.S.C. §

78eee(a)(3)(A).  If the court issues the decree, the court must appoint a trustee[2] and order the

removal of the liquidation proceeding to bankruptcy court.  15 U.S.C. § 78eee(b)(4).  Once the

trustee is appointed, customers of the SIPC member firm can file claims against the SIPA estate,

and "[t]o the extent that the ratable distribution of customer property is insufficient to return to

customers all cash and securities owed to them on a net basis, SIPA also provides for advances

by SIPC to the trustee, within statutorily specified limits, to allow for additional relief to

customers." 1 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 12.02[1][a]

at 12-9 (16th ed. 2011).  The trustee would then evaluate each claim, and the claimant could

appeal a denial of payment by the trustee to the bankruptcy court, and either the trustee or the

claimant could appeal the ruling of the bankruptcy court, and so on.  Id. at ¶¶ 12.11-12.16.

        In this case, SIPC has declined to file an application for a protective decree for the SGC

customers in the Texas federal court – the court which would have jurisdiction over the

liquidation proceeding.  SIPC has apparently concluded that the SGC customers are not covered

by the statute because, among other grounds, SGC did not perform a custody function for the

customers who purchased the SIBL CDs.  (Dkt. No. 3 at 2-3).  According to SIPC, the SEC

shared this conclusion from sometime in 2009 until June 2011 when the SEC "abruptly reversed

course."  Id. at 3.  This timing allegedly corresponds with a threat of a United States Senator to

---

[2]        The trustee is selected solely by SIPC.  15 U.S.C. § 78eee(b)(3).

interfere with the confirmations of two SEC commissioners unless the SEC revisited the issue of

SIPC protection for the SGC customers.  Id.  On June 15, 2011, the SEC delivered a formal

analysis to SIPC ("SEC Analysis") arguing that SGC "has failed to meet its obligations to

customers," that the SGC customers were in need of the protections of the SIPA, and that SIPC

should seek to commence a liquidation proceeding.  Id. at 3; Dkt. No. 1-3 at 2.  SIPC has advised

the SEC that it has considered the SEC Analysis, that it disagrees with the SEC, and that it will

not seek to commence a liquidation proceeding.

        The SIPA gives the SEC authority to seek to compel SIPC to file an application for a

protective decree when the SEC believes that SIPC is failing to discharge its obligations under

the statute.  As set forth in the statute:

> In the event of the refusal of SIPC to commit its funds or
> otherwise to act for the protection of customers of any member of
> SIPC, the Commission may apply to the district court of the
> United States in which the principal office of SIPC is located for
> an order requiring SIPC to discharge its obligations under this
> chapter and for such other relief as the court may deem
> appropriate to carry out the purposes of this chapter.

15 U.S.C. § 78ggg(b).  By its application to this Court, the SEC seeks to exert this statutory

authority over SIPC.  Both the SEC and SIPC advise the Court that this is the first instance

in the 42 years since SIPA was enacted that the SEC has filed such an application.  Thus,

this is a matter of first impression.

## II.     POSITIONS OF THE PARTIES

        At this stage, the primary dispute between the parties revolves around how this

matter should be characterized and how it should proceed.  The SEC contends that because

the statute states that "the Commission may *apply* to the district court" for an order, the

Commission need only file an application and that a formal complaint and summons

pursuant to Rules 3 and 4 of the Federal Rules of Civil Procedure are not required.  The

SEC further states that discovery is neither necessary nor appropriate, because the only

issues before this Court are:

> (1) whether the Commission in fact has determined that SGC, a
> SIPC member, has failed or is in danger of failing to meet its
> obligations to customers; (2) whether one or more of the other
> statutory conditions required for a protective decree are met;
> and (3) whether SIPA Section 11(b) authorizes the Court to
> order SIPC to file an application for a protective decree in the
> Texas Court.

(Dkt. No. 2 at 4).  Indeed, the SEC contends that its "preliminary determination that SGC

has failed or in danger of failing to meet its obligations to customers is not subject to

judicial review by this Court."   Id.  By its Motion for an Order to Show Cause, the SEC

requests that this Court order SIPC to respond to the Application, and that, following such

response, the Court conduct a summary proceeding to determine whether the Application

should be granted.

      SIPC, on the other hand, contends that the statutory language in SIPA does not

require the Court to conduct a summary proceeding.  SIPC argues that the SEC should file

a formal complaint, that the parties should be allowed to conduct discovery, and that this

matter should proceed as a normal civil action pursuant to the Federal Rules of Civil

Procedure.  (Dkt. No. 12 at 18-22).  SIPC argues that the SEC's interpretation of SIPA is

not entitled to deference by this Court and that the statutory language does not support the

contention that the SEC's preliminary determination that SGC has failed to meet its

obligations to its customers is unreviewable by this Court.  (Dkt. No. 3 at 5).  SIPC

maintains that the SEC is seeking improperly to shift the burden onto SIPC and to evade

review because the SEC cannot show that SGC's customers meet the statutory requirements

necessary to obtain the protections conveyed by a SIPC liquidation proceeding.  (Dkt. No.

12 at 6-7).  SIPC argues that tens of thousands of claims seeking over $1 billion are likely

to be filed if a liquidation proceeding is filed, and that, because those claims have no merit,

the adjudication and defense of those claims will impose a large and unnecessary cost upon

SIPC.  Id. at 3.

### III.     THE NATURE OF THE ACTION

The analysis must begin with an examination of the Federal Rules of Civil Procedure.

Rule 1 provides:

> These rules govern the procedure in all civil actions and
> proceedings in the United States district courts, except as stated in
> Rule 81. They should be construed and administered to secure the
> just, speedy, and inexpensive determination of every action and
> proceeding.

FED. R. CIV. P. 1.  Rule 2 adds, quite simply and directly, that "[t]here is one form of action—the

civil action."  FED. R. CIV. P. 2.  Unless an exception listed in Rule 81 applies, civil actions are

required to commence by the filing of a complaint, followed by the issuance and service of a

summons.  See FED. R. CIV. P. 3, 4.

As noted by the Supreme Court, however, Congress can expressly provide by statute "to

allow proceedings more summary than the full court trial at common law."  N. H. Fire Ins. Co. v.

Scanlon, 362 U.S. 404, 407 (1960).  In one of the examples cited in Scanlon, see id. at 407 n.6,

the Supreme Court observed that Congress had clearly expressed an intent for summary

proceedings in two provisions of Section 67 of the then-governing Bankruptcy Act.  Those

provisions stated that "the court shall have summary jurisdiction of any proceeding . . . ."  See 11

U.S.C. §§107(a)(4), 107(f)(4) (1958 edition of the United States Code, available at

www.heinonline.org).  Thus, the intent to allow summary proceedings was explicitly conveyed in the language of the example statute.

In this matter, the statutory language is not nearly as explicit as the above-described example cited favorably by the Supreme Court in <u>Scanlon</u>.  Here, the statute provides that "the Commission <u>may</u> <u>apply</u> to the district court of the United States . . . for an order requiring SIPC to discharge its obligations under this chapter and for such other relief as the court may deem appropriate . . . ."  15 U.S.C. § 78ggg(b) (emphasis added).  The issue before the Court is whether this language also allows summary proceedings that operate as an exception to the federal rules.

To construe this statute, the Court must first begin with its plain meaning, and if the statutory language is clear, the judicial inquiry normally ends there.  <u>See</u> <u>Bennett v. Islamic Republic of Iran</u>, 618 F.3d 19, 22 (D.C. Cir. 2010).  If the language "is subject to more than one interpretation and the meaning of Congress is not apparent from the language itself, the court may be forced to look to the general purpose of Congress in enacting the statute and to its legislative history for helpful clues."  <u>United States v. Braxtonbrown-Smith</u>, 278 F.3d 1348, 1352 (D.C. Cir. 2002), <u>cert</u>. <u>denied</u>, 536 U.S. 932 (2002).  Even when the plain meaning of the statute is discernible, "the court must avoid an interpretation that undermines congressional purpose considered as a whole when alternative interpretations consistent with the legislative purpose are available."  <u>Id.</u>

In this case, the Court finds that the plain meaning of the statute is clear.[3]  The plain meaning of "apply" is "[t]o make a formal request or a motion <apply for a loan> <apply for

---

[3]      The SEC argues that this Court should grant some deference to its interpretation of the statutory provision, while SIPC argues that the SEC is entitled to little, if any, deference.  The Court finds it unnecessary to resolve this dispute, since the plain language

injunctive relief>. . . ."  BLACK'S LAW DICTIONARY 116 (9th ed. 2009).  Likewise, the plain

meaning of "application" is "a request or petition" or a "motion."  Id. at 115.  In S.E.C. v.

McCarthy, 322 F.3d 650, 656-57 (9th Cir. 2003), the court relied upon this plain meaning to hold

that Congress' use of the word "application" in Section 21(e) of the Securities Exchange Act

permitted the use of summary proceedings to enforce an order of the Commission.  Relying upon

Scanlon, the Ninth Circuit ruled that because "'applications' are distinct from 'actions,'"

Congress' use of the term expressed its intent to allow a summary proceeding, rather than a full-

blown civil action.  Id. at 656-57.  In accord with McCarthy, this Court finds that the use of the

term "apply" in Section 11(b) of SIPA [15 U.S.C. § 78ggg(b)] expressed Congress' intent to

permit the SEC to commence a summary proceeding.   By use of the term "apply," Congress did

not intend the instant matter be treated as a "suit of a civil nature."[4]

The Court also concludes that the plain meaning comports with the structure and purpose

of SIPA.  Congress clearly intended that an application by SIPC for a protective decree should be

a summary proceeding, specifying that if the debtor fails to consent to the issuance of the decree,

the application shall be heard within three business days "or at such other time as the court shall

of the statute clearly expresses the intent of Congress.  "When reviewing an agency's
construction of the statute it administers, Chevron directs the courts first to ask whether
Congress has spoken to the specific question at issue. 'If the intent of Congress is clear,
that is the end of the matter; for the court, as well as the agency, must give effect to the
unambiguously expressed intent of Congress.' " Meredith v. Fed. Mine Safety & Health
Review Comm'n, 177 F.3d 1042, 1053 (D.C. Cir. 1999) (quoting Chevron U.S.A., Inc. v.
Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984)).

[4]    The question is whether the current matter falls within the meaning of "suits of a civil
nature," as Rule 1 was worded when Congress enacted SIPA.  See FED. R. CIV. P. 1, advisory
committee's notes to the 2007 Amendments ("The former reference to 'suits of a civil nature' is
changed to the more modern 'civil actions and proceedings.' This change does not affect such
questions as whether the Civil Rules apply to summary proceedings created by statute.  See SEC
v. McCarthy, 322 F.3d 650 (9th Cir. 2003); see also New Hampshire Fire Ins. Co. v Scanlon, 362
U.S. 404 (1960).")

determine, taking into consideration the urgency which the circumstances require." 15 U.S.C. § 78eee(b)(1)(D). As the SEC notes, the purpose of SIPA is to allow a prompt, summary proceeding when a protective decree is sought in order to protect the customers of the troubled SIPC member. This salient purpose would be frustrated if this Court were to hold that the statute mandated a lengthy, full-blown plenary proceeding to resolve a dispute between the SEC and SIPC over whether an application for a protective decree should be filed in the first instance.[5]

SIPC places great weight on the Supreme Court's use of the word "action" to describe the means by which the SEC could proceed against SIPC. See Barbour, 421 U.S. at 421 & n.3. SIPC argues that Barbour therefore supports the contention that Congress intended that applications filed by the SEC against SIPC proceed as plenary actions. This Court disagrees. First and foremost, the issue before the Supreme Court in Barbour was whether the customers of SIPC members had an implied right to compel SIPC to file an application for a protective decree. Id. at 413-14. Determining the precise nature or characteristics of how such a matter would proceed if the SEC were to seek such compulsion was not necessary to the holding in Barbour, and therefore any statements by the Supreme Court about that issue in the opinion are dictum. Moreover, the Supreme Court was far from consistent in its dictum, because it also described a potential filing by the SEC as "seek[ing] in district court to compel the SIPC," id. at 418, and as "enforcement by [the SEC] in court of the obligations imposed upon [SIPC]," id. at 420. Thus, the selected dictum from Barbour provides no convincing support for treating the SEC

---

[5]     SIPC argues that because the SEC has delayed seeking action for more than one year since the failure of SGC, there is no exigency in this proceeding. While this particular matter may not be time-sensitive, Congress clearly intended for the courts to treat applications for protective decrees with a high sense of urgency generally. Thus, any lack of exigency in this instance should not change how the Court construes the overall purpose of SIPA.

Application as a plenary action, particularly since the plain language of the statute and the structure of SIPA demonstrate Congress' intent for a summary proceeding.[6]

## IV.    THE SPECIFIC PROCEDURES TO BE EMPLOYED

Because the Application of the SEC is properly construed as a summary proceeding, the full, formal procedures of the Federal Rules of Civil Procedure are neither required nor appropriate.  As our Circuit Court of Appeals has explained, "'[s]ummary' proceedings by definition are those conducted 'in a prompt and simple manner.'"  United States v. Hubbard, 650 F.2d 293, 310 n.66 (D.C. Cir. 1980) (quoting BLACK'S LAW DICTIONARY 1084 (5th ed. 1979)). Nonetheless, even though this is a summary proceeding, this Court has discretion to apply "some, if not all" of the Federal Rules of Civil Procedure as circumstances and justice require. See 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1026 (3d ed. 2002).

The Court will defer ruling on all of the specific procedures that will be employed in this summary proceeding.  Up to this point, the parties have primarily sparred over whether this Application should proceed as a plenary or summary proceeding.  Therefore, the parties have not fully briefed what procedures should apply in a summary proceeding.  The Court hereby directs SIPC and the SEC to address that issue in their respective memoranda in response and reply to

---

[6]      For the same reasons, the Court finds unavailing SIPC's reliance on the fact that the SEC used the word "action" in their briefs before the Supreme Court in Barbour to describe the means by which the SEC could proceed against SIPC.  (Dkt. #12 at 8-14).  Moreover, the Court notes that during oral argument in Barbour, counsel for SIPC told the Supreme Court that a proceeding by the SEC against SIPC was "perhaps describable as in the nature of mandamus or mandatory injunction but not quite either one . . . ."  Transcript of Oral Argument at 13, SIPC v. Barbour, 421 U.S. 412 (1975) (No. 73-2055).  SIPC's statement during oral argument in Barbour is not helpful to its present position, since writs of mandamus fall within the exception specified in Rule 81(b) and are treated as summary proceedings.  See FED. R. CIV. P. 81(b); Appeal of FTC Line of Business Report Litigation, 595 F.2d 685, 704-05 (D.C. Cir. 1978).

the SEC Application.  After the issues have been fully briefed, the Court can make an informed decision on specific procedures.

Nonetheless, there is one aspect of procedure that is ripe for decision now.  As stated above, the SEC contends that its "preliminary determination that SGC has failed or in danger of failing to meet its obligations to customers is not subject to judicial review by this Court." (Dkt. No. 2 at 7).  This contention is untenable.  The statute provides that "[i]n the event of the refusal of SIPC to commit its funds or otherwise to act for the protection of customers of any member of SIPC, the Commission may apply to the district court . . . for an order requiring SIPC to discharge its obligations under this chapter . . . ."  15 U.S.C. § 78ggg(b).  The plain meaning of this language makes the relief available to the SEC contingent upon an affirmative determination that SIPC has refused to commit funds or otherwise protect customers.  This determination must be made by the Court, not unilaterally by the SEC.  In other parts of SIPA, Congress provided that the SEC could "require" SIPC to take certain action without court intervention.  See 15 U.S.C. § 78ccc(e)(3) ("[t]he Commission may . . . require SIPC to adopt, amend, or repeal any SIPC bylaw or rule, whenever adopted.") (emphasis added); 15 U.S.C. § 78ggg(c)(1) ("[t]he Commission may . . . require SIPC to furnish it with such reports and records or copies thereof as the Commission may consider necessary or appropriate in the public interest . . . .") (emphasis added).  It is significant that court intervention is specified in this provision, whereby the SEC must "apply" for an order to compel action rather than simply "require" the action.  The use, plain meaning and context of "apply" in Section 78ggg(b), in contrast to the use of "require" elsewhere in SIPA, strongly suggests that Congress intended that the SEC must ask this Court for relief and demonstrate that it is entitled to such relief.

This construction is supported by a review of the SIPA provision governing the situation when SIPC applies to the district court for a protective decree against a SIPC member.  That statute provides that "[i]f SIPC determines -- (A) the member [of SIPC] has failed or is in danger of failing to meet its obligations to customers; and (B) one or more [other specified] conditions . . . exist with respect to such member," then "SIPC may . . . file an application for a protective decree . . . ."  15 U.S.C. § 78eee(a)(3) (emphasis added). Notwithstanding the fact that this statute might appear to be written to grant SIPC unilateral authority to "determine" whether a SIPC member "has failed or is in danger of failing to meet its obligations to customers," two Circuit Courts of Appeal have construed this language to require a *de novo* review by the district court of SIPC's determination in the face of an objection by a broker-dealer to an application brought by SIPC.  See Securities and Exchange Comm'n v. Alan F. Hughes, Inc., 461 F.2d 974, 979 (2d Cir. 1972); Securities Investor Protection v. Blinder, Robinson & Co., Inc., 962 F.2d 960, 967 (10th Cir. 1992) (citing Hughes).  There is no reason why a determination by the SEC that SIPC has failed to discharge its duties should not also be given *de novo* review in the face of an objection by SIPC in a proceeding brought by the SEC pursuant to Section 78ggg(b).  The construction proffered by the SEC would be anomalous, since the language in Section 78ggg(b) does not make relief expressly contingent upon a "determination" by the SEC when the SEC brings an application, but Section 78eee(a)(3) expressly provides that relief is contingent upon a "determination" by SIPC when SIPC brings an application.  It makes no sense to grant more deference to the SEC than is granted to SIPC, based upon language that Congress wrote in a clearly less-deferential manner.

In sum, as part of its evaluation of the instant Application, the Court must determine whether SIPC has refused to commit its funds or otherwise refused to act for the protection of

customers of any SIPC member.  In doing so, the Court must do so in summary fashion, on a

short timeline, and with the understanding that this proceeding will only determine whether SIPC

should be compelled to file an application for a protective decree in the Texas federal court.  If

SIPC is compelled to file a protective decree, the Texas federal court will determine whether

such a decree should be granted.  If a liquidation proceeding commences, the Texas federal court

will determine whether SIPC is liable for any claims that may be filed by customers in that

liquidation proceeding.  The parties should, with scalpel-like precision, address in their

remaining briefing the procedures, burdens, and discovery that are necessary and appropriate

with these circumstances in mind.

## CONCLUSION

For the foregoing reasons, the Ex Parte Motion for an Order to Show Cause is

GRANTED, and the Motion to Strike is DENIED.  An Order accompanies this Memorandum.


SO ORDERED.

Date: February 9, 2012                                       _____

                                                            ROBERT L. WILKINS
                                                            United States District Judge