## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

Securities and Exchange Commission,

Applicant,

v.

Securities Investor Protection Corporation,

Respondent.

Civil Action No. 11-mc-678 (RLW)

## MEMORANDUM OPINION AND ORDER

In SIPC v. Barbour, 421 U.S. 412 (1975), the Supreme Court held that persons claiming

to be customers of a broker dealer do not have an implied right of action under the Securities

Investor Protection Act ("SIPA") to compel the Securities Investor Protection Corporation

("SIPC") to exercise its statutory authority for their benefit.  Instead, the Court held that

Congress granted the Securities and Exchange Commission ("SEC") the role "of 'plenary

authority' to supervise the SIPC[,]" which includes the statutory authority to "seek in district

court to compel the SIPC 'to commit its funds or otherwise to act for the protection' of such

customers."  Id. at 417-18 (quoting S. Rep. No. 91-1218, p.1 (1970) and 15 U.S.C. § 78ggg(b)).

As described in this Court's prior opinion,[1] this proceeding is the first instance since SIPA was

enacted 42 years ago in which the SEC has sought to use its "plenary authority" to compel the

SIPC to file an application for a protective decree.  Thus, as matters of first impression, this

---

[1] S.E.C. v. Securities Investor Protection Corp., ___ F.Supp.2d ___, 2012 WL 403602 (D.D.C. Feb 09, 2012).

Court must determine the standard of proof required of the SEC, what process is due the parties, and whether the SEC has met its burden of proof.

I.    **BACKGROUND**

As set forth in the Court's prior opinion, of which familiarity is presumed, this case is an outgrowth of the 2009 collapse of a group of companies owned or controlled by Robert Allen Stanford.  Stanford allegedly sold over $7 billion worth of certificates of deposit ("CDs") that were issued by the Stanford International Bank, Ltd. ("SIBL"), an Antiguan bank.  The CDs were marketed by the Stanford Group Company ("SGC"), a now-defunct broker-dealer that was registered with the SEC and that was a member of SIPC.

The SEC contends that Stanford actually misappropriated billions of dollars and operated a fraudulent "Ponzi scheme" – in which obligations of the CDs were paid using the proceeds from the sale of new CDs rather than from earnings, liquid assets or reserves.  Following an investigation, the SEC brought a civil enforcement action against Stanford and his entities in the Texas federal court.  Federal prosecutors have also brought criminal charges, and on March 6, 2012 a jury in the Texas federal court convicted Stanford of conspiracy, wire fraud, mail fraud, obstruction of justice and money laundering.  U.S. v. Robert Allen Stanford, 09-cr-00342 (S.D. Tx.), Dkt. No. 808.   On June 14, 2012, Stanford was sentenced to 1,320 months (110 years) in prison.  Id., Dkt. No. 878.

The Texas federal court has appointed a Receiver to oversee the assets of SGC and other Stanford entities.  The Receiver reports that as of February 2009, SGC had approximately 32,000 active accounts for which it acted as the introducing broker.

In early 2009, the Receiver asked SIPC to review whether the SGC customers who were allegedly defrauded were entitled to protection from SIPC.  SIPC has declined to file an

application for a protective decree for the SGC customers in the Texas federal court – the court which would have jurisdiction over the liquidation proceeding.  SIPC has concluded that the SGC customers are not covered by the statute because, among other grounds, SGC did not perform a custody function for the customers who purchased the SIBL CDs.  On June 15, 2011, the SEC delivered a formal analysis to SIPC ("SEC Analysis") arguing that SGC "has failed to meet its obligations to customers," that the SGC customers were in need of the protections of the SIPA, and that SIPC should seek to commence a liquidation proceeding.   SIPC has advised the SEC that it has considered the SEC Analysis, that it disagrees with the SEC, and that it will not seek to commence a liquidation proceeding.  Hence, the SEC seeks an order from this Court compelling SIPC to commence such a liquidation proceeding.

.

## II.     THE LEGAL STANDARDS

### A.  Burden of Proof

The parties have differing viewpoints with respect to the critical issue of the standard of proof required of the SEC and what process is due the parties.   The SEC contends that probable cause supported by hearsay is sufficient to carry its burden, while SIPC argues that the applicable standard is preponderance of evidence supported by admissible evidence.  To answer these questions, this Court will observe the recent admonition of our Circuit Court to "heed Professor Frankfurter's timeless advice:  '(1) Read the statute; (2) read the statute; (3) read the statute!'" Kellmer v. Raines, 674 F.3d 848, 850 (D.C. Cir. 2012) (quoting Henry J. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 202 (1967)).

Heeding this sage advice, the Court turns to the words of the statute.  The SIPA provision at issue reads as follows:

> In the event of the refusal of SIPC to commit its funds or otherwise to act for the protection of customers of any member of SIPC, *the Commission may apply to the district court of the United States* in which the principal office of SIPC is located *for an order requiring* SIPC to discharge its obligations under this chapter and for such other relief as the court may deem appropriate to carry out the purposes of this chapter.

15 U.S.C. § 78ggg(b) (emphasis added).   Thus, the SIPA statute clearly specifies that the SEC must proceed by "apply[ing] to the district court . . . for an order requiring SIPC" to comply with the statute.

Although not cited by the parties, the SIPA statute provides some general, but significant, guidance about how its provisions should be interpreted. The statute specifies that except as expressly provided otherwise, SIPA should be construed as if it were an "amendment to" and "included as a section of" the Securities Exchange Act of 1934.  15 U.S.C. § 78bbb.[2]  (The Securities Exchange Act of 1934 is also commonly referred to as the "1934 Act."  Id.)

This interpretative guidance is noteworthy, because the 1934 Act contains a specific provision that authorizes the SEC to file an "application" for an "order" that "command[s]" a person or entity "to comply" with the 1934 Act.  15 U.S.C. § 78u(e)(1).[3]  This provision is found in Section 21(e) of the 1934 Act [codified at 15 U.S.C. § 78u(e)].  See text at http://www.sec.gov/about/laws/sea34.pdf.  Such an application, "commanding" a person "to comply" with the 1934 Act, bears a remarkably close resemblance to an application by the SEC,

---

[2] The entire provision reads:  "Except as otherwise provided in this chapter, the provisions of the Securities Exchange Act of 1934 [15 U.S.C.A. § 78a et seq.] (hereinafter referred to as the "1934 Act") apply as if this chapter constituted an amendment to, and was included as a section of, such Act."  15 U.S.C. § 78bbb.

[3] The entire provision reads: "Upon application of the Commission the district courts of the United States and the United States courts of any territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding (1) any person to comply with the provisions of this chapter, the rules, regulations, and orders thereunder . . . ."  15 U.S.C. § 78u(e)(1).

pursuant to SIPA, "requiring" SIPC "to discharge its obligations" under SIPA.  The similarity between the two provisions is quite significant since SIPA is meant to be construed as if it were part of the 1934 Act.

Several courts have had occasion to determine the burden of proof attendant to an SEC application to enforce compliance pursuant to Section 21(e) of the 1934 Act.  Our Circuit has held that the preponderance of the evidence standard is the appropriate burden of proof when the Commission seeks a permanent injunction pursuant to the 1934 Act.  Securities and Exchange Commission v. Savoy Industries, Inc., 587 F.2d 1149, 1168-69 (D.C. Cir. 1978).   While the court in Savoy did not specifically state that the SEC application for injunction was brought pursuant to Section 21(e) of the 1934 Act, this basis for the application was made clear in a subsequent opinion.  Securities and Exchange Commission v. Savoy Industries, Inc., 665 F.2d 1310, 1317 n.54 (D.C. Cir. 1981) ("Section 21(d) of the Securities Exchange Act, 15 U.S.C. § 78u(d) (1976), authorizes SEC to sue in the federal district courts for injunctions against violations of the federal securities laws. By § 21(e), 15 U.S.C. § 78u(e) (1976), these courts are empowered to issue injunctions commanding compliance with the laws and regulations promulgated thereunder.").   Accordingly, in this Circuit, the SEC must prove a violation of the 1934 Act by a preponderance of the evidence to obtain a permanent injunction.  Id.; see also S.E.C. v. International Loan Network, Inc.. 770 F.Supp. 678, 688 n.10 (D.D.C. 1991) (applying preponderance standard to SEC request for injunction, citing Savoy and Section 21(e) of the 1934 Act); S.E.C. v. Moran, 922 F.Supp. 867, 887-90 (S.D.N.Y. 1996) (Judge Newman of the Second Circuit, sitting by designation, follows Savoy and holds that the preponderance of evidence standard applies to civil enforcement actions brought by the Commission pursuant to Section 21(e) of the 1934 Act); S.E.C. v. Tome, 638 F.Supp. 596, 620 n.45 (S.D.N.Y. 1986)

(noting that in injunctive action brought by SEC pursuant to Section 21(e) of the 1934 Act, "preponderance of the evidence standard is the proper burden of proof . . . .").

While a strong argument could be made that the current application by the Commission, brought pursuant to 15 U.S.C. § 78ggg(b), seeking an order compelling SIPC to comply with the requirements of the SIPA statute, is really the same as an application brought by the Commission pursuant to 15 U.S.C. § 78u(e)(1) to enforce the 1934 Act, the Court need not reach that issue today. It shall suffice for present purposes to hold that <u>Savoy</u> and the related authority pursuant to the 1934 Act compel the conclusion that the preponderance standard is the appropriate burden for the Commission to bear to obtain the relief sought in the present Application pursuant to 15 U.S.C. § 78ggg(b). This result seems particularly sound not only because Congress has directed that SIPA be construed as if it were a part of the 1934 Act, but also because of the preference for the preponderance standard in civil litigation generally. <u>See</u> <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 387-91 (1983) (holding that the preponderance of evidence standard is generally appropriate in a civil action brought by a private plaintiff to adjudicate violations of the 1934 Act). [4] In addition, the Court is mindful that SIPC, a corporate body, is entitled to due process in the present proceeding, even if the SEC is considered to be its plenary supervisor under the SIPA statutory scheme. It is quite clear that the initiation of a SIPA liquidation would potentially

---

[4]   The SEC argues that the preponderance standard is not appropriate because this is merely a proceeding to determine whether SIPC should be required to initiate a liquidation proceeding and that the claimants will have to establish later, by a preponderance of the evidence, that they are "customers" within the meaning of the statute. Dkt. No. 25 at 17-18. The SEC asserts that when SIPC elects to initiate a liquidation, it does so only upon a preliminary showing that there "may" be customers who need protection, a standard akin to probable cause and less than a preponderance. <u>Id</u>. This argument misses the mark. SIPC has reviewed the matter and made the determination that there are no customers who "may" need protection under SIPA – thus, the nature of this proceeding is that the SEC seeks to overturn that determination. In that context, Congress specified that the SEC would have to "apply" to this district court to overturn the SIPC, and it is fitting that Congress wanted the SEC to meet a higher burden to overturn the conclusion of the SIPC (who has the authority in the first instance to make the determination).

involve tens of thousands of claimants and entail millions of dollars in administrative costs, even if all of the claims were ultimately denied.  Such a cost would place a great burden upon SIPC that is not eliminated by the SEC offer to "loan" funds to SIPC, since SIPC ultimately would have to repay any such loan to the SEC, resulting in costs that would be ultimately borne by SIPC members rather than the SEC.

Accordingly, the SEC has the burden of proving, by a preponderance of the evidence, that SIPC has "refus[ed] . . . to commit its funds or otherwise to act for the protection of customers of any member of SIPC."  See 15 U.S.C. § 78ggg(b).


### B.   Definition of "Customer"

In this case, it is undisputed that the Stanford Group Company (SGC) was a SIPC member.  However, it is also undisputed that Stanford International Bank, Ltd. ("SIBL"), the Antiguan entity that issued the fraudulent CDs was not a SIPC member.  The SIPA statute provides protection, under certain specified circumstances, to the customers of SIPC members.  Thus, the key issue in dispute is whether the persons who purchased the SIBL CDs are "customers" of SGC within the meaning of SIPA, because if they are, then SIPC has refused to act for their protection and the Application should be granted.  On the other hand, if they are not customers, then the Application must be denied.

As earlier, we begin with the text of the statute.  SIPA defines "customer" as follows:

> **(A) IN GENERAL**
> The term 'customer' of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer.

**(B) INCLUDED PERSONS**
    The term 'customer' includes—
    (i) any person **who has deposited cash with the debtor for the purpose of purchasing securities**; . . . .

15 U.S.C. § 78lll(2)(A)-(B)(emphasis added).

Here, the SEC appears to be relying upon the definition in § 78lll(2)(B), because it asserts in the June 15, 2011 SEC Analysis that "SIPA defines 'customer' to include any person who has deposited cash with the debtor for the purpose of purchasing securities."  Dkt. No. 1-3 at 9.  See also Dkt. No. 25 at 22.  The SEC did not emphasize any other theory for analyzing the "customer" issue in its briefs or at oral argument.  Thus, the Court will examine whether the investors who purchased the SIBL CDs "deposited cash with [SGC] for the purpose of purchasing securities."

As summarized by one leading treatise, the SIPA statute "attempts to protect customer interests in securities and cash *left with* broker-dealers. . . ."  Loss & Seligman, Securities Regulation ¶8.B.5.a, p. 3290 (3rd ed. 2003) (citing legislative history) (emphasis added). Another prominent treatise states that "SIPA is designed to protect securities investors against losses stemming from the failure of an insolvent or otherwise failed broker-dealer to properly perform its role as the *custodian* of customer cash and securities."  1-12 Collier on Bankruptcy, P. 12.01 (16th ed.) (emphasis added).   The usage of the phrase "left with" in the first description and of the term "custodian" in the second description is notable – both usages are in accordance with the plain meaning of statutory term "deposit," which is "to place esp. for safekeeping or as a pledge"[5] or "[to] giv[e] money or other property to another who promises to preserve it or to use it and return it in kind."[6]

---

[5]  Webster's Ninth New Collegiate Dictionary at 341 (1991).
[6]   Black's Law Dictionary at 504 (9th ed. 2009).

Accordingly, it is well settled that "the critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 236 (2d Cir.2011) (quoting Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791, 801 (6th Cir.1995)).  The "customer" definition has therefore been described as "embod[ying] a common-sense concept: An investor is entitled to compensation from the SIPC only if he has entrusted cash or securities to a broker-dealer who becomes insolvent; if an investor has not so entrusted cash or securities, he is not a customer and therefore not entitled to recover from the SIPC trust fund."  In re Brentwood Sec., Inc., 925 F.2d 325, 327 (9th Cir.1991).  To prove entrustment, the claimant must prove that the SIPC member actually possessed the claimant's funds or securities.

> In order to qualify for customer status, a claimant must demonstrate that cash or securities were entrusted to the debtor for the purpose of effecting protected securities transactions.  The concept of entrustment is a judicially developed notion that combines the dual requirements *that the debtor actually must have received, acquired or held the claimant's property*, and that the transaction giving rise to the claim must contain the indicia of a fiduciary relationship between the claimant and the debtor.  Under the "bright-line rule" applied by courts, a claimant will not be entitled to customer protection under SIPA unless the debtor *actually receives the claimant's cash or securities*; the debtor *must actually have come into possession or control*.

1-12 Collier on Bankruptcy, P 12.12 (emphasis added).

Those are the relevant legal principles.  Let us now turn to the facts.

## III.    APPLICATION OF THE LAW TO THE FACTS

In an effort to narrow the issues, the Court requested that the SEC and SIPC attempt to reach agreement on as many facts as possible.  The parties obliged by agreeing to the following stipulated facts:

1.   Stanford Group Company ("SGC") was a Houston-based broker-dealer that was registered with the Commission and a member of SIPC.

2.   Stanford International Bank, Ltd. ("SIBL") was a bank organized under the laws of Antigua.

3.   SIBL offered certificates of deposit ("CDs") to investors.  In order to purchase a SIBL CD, an investor had to open an account with SIBL.  CD investors wrote checks that were deposited into SIBL accounts and/or filled out or authorized wire transfer requests asking that money be wired to SIBL for the purpose of opening their accounts at SIBL and purchasing CDs.

4.   Most SGC investors either received the physical CD certificates or had them held by an authorized designee, including Stanford Trust Company. To the extent that some SIBL CD investors did not receive the physical certificates, the SEC is not relying on that fact to support its claims in this proceeding.

5.   SIBL CD investors received periodic statements from SIBL reflecting the balances in their SIBL accounts, including their CD balances.

6.   In the United States, disclosure statements for SIBL's CDs stated that "SIBL's products are not subject to the reporting requirements of any jurisdiction, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation." A version of the marketing brochures for SIBL's CDs stated that SIBL CDs "are not subject to the reporting requirements of any jurisdiction outside of Antigua and Barbuda, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation or the bonding requirements thereunder. There is no guarantee investors will receive interest distributions or the return of their principal."

7.   SIBL and Stanford Trust Company are not and never have been members of SIPC.

8.   For purposes of its Application in this proceeding, the SEC is relying on investors' deposit of funds for the purchase of SIBL CDs; it is not relying on transactions involving any other securities (or funds for other securities).

9.   The SEC does not contend that, during the relevant time period, Stanford International Bank, Ltd. ("SIBL") and Stanford Group Company ("SGC") provided SIBL certificate of deposit ("CD") investors with U.S. tax Form 1099 for the income purportedly earned on SIBL CD investments.

See Dkt. No. 30-1; Dkt. No. 31-1.

Pursuant to the stipulated facts, the SEC cannot show that SGC ever physically possessed the investors' funds[7] at the time that the investors made their purchases. As noted above, "CD investors wrote checks that were deposited into SIBL accounts and/or filled out or authorized wire transfer requests asking that money be wired to SIBL for the purpose of opening their accounts at SIBL and purchasing CDs." The investors' checks were not made out to SGC and were never deposited into an account belonging to SGC. Accordingly, under a literal construction of the statute, the investors who purchased SIBL CDs are not "customers" of SGC within the meaning of SIPA. See, e.g. In re Brentwood, 925 F.2d at 328-29 (where claimant made out checks to an entity other than the SIPC member, the funds "never passed through the hands" of the SIPC member; denying customer status); In re Aozora Bank Ltd., 2012 WL 28468, *7 (S.D.N.Y. Jan. 4, 2012) (claimants had not "deposited cash" with the SIPC member where claimant sent their funds to a third-party, and then that third-party sent the funds to the SIPC member).

However, the SEC contends that a much broader construction of the statute should apply in this case. The SEC argues that the "application [of the customer definition] does not depend simply on the identity of the entity with which funds are deposited." Dkt. No. 25 at 22-24. As support for this construction, the SEC cites In re Old Naples Securities, Inc., 223 F.3d 1296 (11th Cir. 2000) and In re Primeline Securities Corp., 295 F.3d 1100 (10th Cir. 2002). Id. It is therefore necessary to examine those two cases.

In both Primeline and Old Naples, the claimants were victims of fraud. In the Old Naples case, the SIPC member firm was "Old Naples Securities," an introducing broker. 223 F.3d at 1299. A separate clearing broker (a firm named Howe Barnes) was supposed to handle the

---

[7]   The SEC is not asserting the theory that SGC ever possessed the investors' securities.

investor funds and carry the accounts of the clients of Old Naples Securities.[8] Id. Mr.

Zimmerman, the owner of Old Naples Securities, also owned another firm named "Old Naples

Financial Services." Id. Contrary to established policy, none of the funds at issue were

deposited with the clearing broker. Instead, Zimmerman had the clients make checks payable to

Old Naples Securities or wired to Old Naples Financial Services, and rather than purchasing

bonds as was intended, Zimmerman misappropriated the funds. Id. at 1301. The court held that

the claimants who had wired funds to Old Naples Financial Services were "customers" protected

by SIPA, even though that particular entity was not a SIPC member. The court reasoned that

because Zimmerman was an agent of Old Naples Securities, the SIPC member firm, and because

Zimmerman owned both firms, the claimants would be deemed customers of the member firm

where the circumstances reasonably showed that the claimants "had no reason to know that they

were not dealing with [Old Naples Securities]." Id. at 1303. The court also noted that because

Zimmerman had used some of the funds wired to Old Naples Financial Services to pay the

expenses of Old Naples Securities, it was appropriate to conclude that "[Old Naples Securities]

acquired control over all of the claimant's funds." Id. at 1303-04.

     In Primeline, the SIPC member, Primeline Securities Corporation, was an introducing

broker, and "[a]s such, it was not permitted to hold funds or securities for customers, and was not

authorized to carry customer accounts. Primeline cleared all client securities transactions

through a clearing broker on a fully disclosed basis." 295 F.2d at 1103-04 n.1. Accordingly,

"[a]ll checks for investments through Primeline were to be made through Primeline's clearing

---

[8]   The introducing broker solicits and accepts orders for securities, but it "does not accept any money, securities or property to guarantee or secure [the] trade." Thomas Lee Hazen, Law of Securities Regulation § 14.2[2][B] (6th ed.). Instead, the introducing broker contracts with a clearing broker, and it is the clearing broker who "actually effectuates the trade[,] . . . handles the customer funds and . . . operates as a bank with respect to the transaction and the customer's funds generally." Id.

broker. . . ." Id.  However, that process was not followed for the funds at issue, as "[n]one . . .

were deposited with Primeline or its clearing broker." Id. at 1104.  Instead, Mr. Ameen, who

worked at Primeline, had directed the claimants to make out checks to him or to one of various

company bank accounts that he controlled, and he never purchased any actual securities. Id.

Relying upon Old Naples, the court held that because Ameen had been given the funds, because

Ameen had both actual and apparent authority to engage in securities transactions as an agent of

Primeline, and because the claimants reasonably believed that they were dealing with Primeline,

the funds given to Ameen could be deemed to have been "deposited" with Primeline within the

meaning of SIPA. Id. at 1104-08.

     As described by the SEC, "Old Naples and Primeline expressly reject the notion that the

'customer' determination requires that cash be deposited directly with the broker-dealer." Dkt.

No. 25 at 24.  Consequently, the SEC points the Court to evidence showing that Stanford

controlled SGC, SIBL and numerous other entities, and that he exercised his control not only to

divert the proceeds from the sales of the SIBL CDs for his own personal use, but also to pay

some of the expenses and obligations of SGC. Dkt. No. 1 at 4-5 (¶10).  The SEC has also

submitted affidavits and other materials indicating that some SGC clients were told that SGC and

SIBL were both part of the "Stanford Group" and that some clients therefore believed that they

were purchasing CDs that were protected by SIPA, even though SIBL was not a SIPC member

firm. Dkt. No. 1 at 3-4, 5-6 (¶8,¶11).  Thus, the SEC argues that this case is indistinguishable

from Old Naples and Primeline.  The SEC even contends that its "formal determination that

those cases rightly interpret SIPA is entitled to Chevron-style deference" by this Court. Id.

(citing Arizona Pub. Serv. Co. v. EPA, 211 F.3d 1280 (D.C. Cir. 2000)).

As an initial matter, the Court does not believe that the legal interpretation of the SEC is entitled to <u>Chevron</u> deference, because the current SEC interpretation cannot be squared with SEC's longstanding interpretation of SIPA.  Almost 30 years ago, a leading SEC official stated the presumption that clients of an introducing broker are not "customers" within the meaning of SIPA:

> [F]or purposes of . . . the Securities Investor Protection Act of 1970 ("SIPA") ***the introducing broker-dealer's customers are presumed to be customers of the carrying broker-dealer***.

Letter from Richard G. Ketchum, Director, Division of Market Regulation of David Marcus, New York Stock Exchange, January 14, 1985, ("Ketchum Letter") (emphasis added) [located at http://www.sec.gov/divisions/marketreg/mr-clearing011485.pdf]. As mentioned above, introducing brokers are prohibited from possessing or taking custody of the funds or securities of the clients; this custodial role is assumed by the clearing broker.  This distinction is ordinarily dispositive.  In 1992, while explaining why introducing brokers are required to maintain a lower level of "net capital" than other brokers, the SEC again linked the fact that introducing brokers never possess client funds to the lack of SIPA "customer" status for the clients of introducing brokers:

> The [Market Regulation] Division has interpreted the net capital rule and Rule 15c3-3 to require that, ***for the purposes of*** the Commission's financial responsibility rules and ***SIPC, the introducing firm's customers should be treated as customers of the clearing firm***.

SEC Release No. 34-31511, 57 Fed. Reg. 56973, 56980 (Dec. 2, 1992) (emphasis added) (citing the Ketchum Letter).  In 1997, the SEC reiterated that the identity of the broker who "handle[s] customer funds and securities" was the key factor in determining "customer" status under SIPA:

> The respective duties and obligations of an introducing broker and its clearing firm are described in the clearing agreement executed by the parties.  This agreement typically contains various requirements imposed by the clearing firm

14

with respect to the handling of customer accounts by the clearing and introducing brokers, and the clearing firm's maintenance of customer assets. . . . *[A]s a legal matter, for purposes of the Securities Investor Protection Act of 1970 . . . , a customer is the customer of the clearing firm*.

SEC Release Nos. 33-7382 et al., 63 SEC Docket 1669, 1681 (Jan. 22, 1997) (emphasis added). The SEC has reaffirmed this interpretation as recently as June of 2011.  SEC Release No. 34-64676, 76 Fed. Reg. 37572, 37585 n.130 (June 27, 2011) ("the customers of introducing broker-dealers are presumed to be customers of the clearing broker-dealer for purposes of the Commission's financial responsibility rules and SIPA," citing Ketchum Letter).

Thus, for nearly 30 years, the SEC has interpreted SIPA to mean that the clients of introducing brokers are presumptively not "customers" within the meaning of the statute where 1) the introducing broker does not hold funds or securities for the client, 2) the introducing broker promptly forwards all funds and securities to the clearing broker, 3) the introducing broker has a fully disclosed clearing agreement with the clearing broker stating that the clients are customers of the clearing broker for purposes of SIPA and the SEC's financial responsibility rules, and 4) the clearing firm issues account statements directly to the clients with all of the pertinent information, including that the client's funds or securities are located at the clearing firm and not with the introducing broker.  See SEC Release No. 34-31511, 57 Fed. Reg. at 56978, 56980.  Thus, the SEC has consistently maintained that a client of an introducing broker is presumptively not a "customer" within the meaning of SIPA, except in those circumstances when "an introducing firm [is] in possession of customer property."  Id., 57 Fed. Reg. at 56978 n.17.  In contrast, the current SEC interpretation would bestow customer status where the client reasonably believed that he was investing with the introducing broker and where the entity receiving client funds used some of the proceeds to pay the expenses of the introducing broker. Because this current SEC interpretation eschews the dispositive nature of "possession" of the

client funds at the time of the investment transaction, contrary to the longstanding view of the SEC, it is entitled to little, if any, deference.  See Watt v. Alaska, 451 U.S. 259, 272-73 (1981) (where agency had interpreted statute at time of its passage, and for 10 years thereafter, in a consistent manner, the agency's "current interpretation, being in conflict with its initial position, is entitled to considerably less deference."); INS v. Cardoza–Fonseca, 480 U.S. 421, 446 n.30, (1987) (citing Watt).

The SEC interpretation is also undermined by the fact that the SEC seeks to broaden the scope of SIPA liability well beyond the plain meaning of the statutory term "deposited."  Such a broadening is improper here, where the "[j]udicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provisions."  In re Stalvey & Assocs., Inc., 750 F.2d 464, 472 (5th Cir. 1985).  Indeed, courts have consistently held that the "customer" definition should be construed narrowly.  See generally SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314 (2d Cir.1976); SEC v. F.O. Baroff Co., Inc., 497 F.2d 280 (2d Cir.1974); Securities Investor Protection Corp. v. Associated Underwriters, Inc., 423 F.Supp. 168, 177 (D. Utah 1975).  "In general, the courts have avoided interpreting the concept of customer too expansively, in light of the Act's [SIPA's]  purposes."  Thomas Lee Hazen, Law of Securities Regulation § 14.24 (6th ed.).  At oral argument, the SEC conceded that it was not aware of any authority contrary to the proposition that the "customer" definition in SIPA should be construed in a narrow manner.  Dkt. No. 33 at 32.

Finally, the SEC's argument is undermined by the fact that it seeks to expand "customer" status even beyond the circumstances that were present in Old Naples and Primeline.  As stated above, both of those cases involved an introducing broker who never deposited the client funds at issue with the clearing broker, in clear violation of proper operating procedure.  Furthermore,

in both <u>Old Naples</u> and <u>Primeline</u>, the introducing broker (or its agent) never actually purchased any securities with the client funds at issue.  Neither of those circumstances is present here.  As described above, the SEC either stipulated or did not contest that SGC was a "fully disclosed" introducing broker, Dkt No. 1 at 4 (¶9); Dkt. No. 23-2 at 29, and that "SGC's customer accounts were cleared and carried by third-party broker-dealers."  Dkt. No. 1 at 4 (¶9).  Furthermore, the SEC has stipulated that the SIBL CDs were in fact purchased and did in fact exist for the SGC clients.  Dkt. No. 30-1 at 2.  In <u>Old Naples</u> and <u>Primeline</u>, the courts expanded the meaning of "deposited" to hold that client funds were deemed deposited with an introducing broker where the client gave funds to the introducing broker (or its agent) for the purchase of securities that were never bought.  That is not what happened here, and this Court does not believe it appropriate to expand the meaning of "deposited" even further.  Such further expansion is particularly inappropriate where SGC processed the CD sales at issue using a clearing broker, thereby minimizing the risks sought to be protected by the SIPA statute and operating in a manner that has caused the SEC to maintain for 30 years that the clients of an introducing broker are customers of the clearing broker for purposes of SIPA.  Nor is the Court swayed by the SEC's argument that some of the CD sales proceeds were used to pay expenses of SGC and that some of the investors were told that the CDs were protected by SIPA.  Those assertions, even if true, run too far afield from the key issue, which is whether the investor entrusted cash to SGC for the purpose of effecting a securities transaction.[9]  In sum, the interpretation sought by the SEC is extraordinarily broad and would unreasonably contort the statutory language.

---

[9]  The SEC also argues that SGC, in some instances, issued account statements to the investors. Dkt. No. 25 at 19-20.  However, these statements (examples of which were attached) did not suggest at all that funds were held by SGC or that the CDs were issued or held by SGC; instead, each page contained a disclosure declaring that the statement was "for informational purposes

### Conclusion

The Court is truly sympathetic to the plight of the SGC clients who purchased the SIBL CDs and now find themselves searching desperately for relief.  Robert Allen Stanford's 110 year sentence may bring some measure of justice to the SGC clients, but it will not make them financially whole.  But this Court has a duty to apply the SIPA statute as written by Congress, and, as other courts have done, this Court also has a duty to construe narrowly the "customer" definition of the statute.  For the foregoing reasons, the SEC has failed to meet its burden, by a preponderance of the evidence, of proving that SIPC has "refus[ed] . . . to commit its funds or otherwise to act for the protection of customers of any member of SIPC."  Indeed, because the issue turns on uncontested facts and an interpretation of law[10], the Court holds that the SEC would have failed to meet even the lesser burden of probable cause.  The Application of the SEC is therefore denied.  An Order accompanies this Memorandum.


**SO ORDERED.**
Date: July 3, 2012


_____
ROBERT L. WILKINS
United States District Judge


---

only" and that "[i]t does not replace or supercede [sic] the account statements provided by the issuing financial institution."  Dkt. No. 1-2 at 8.

[10]   Because the Court holds that the SEC cannot prevail based upon the uncontested facts, the Court need not decide what discovery or other procedural rights are due the parties in this type of an application.